UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Michael D. Connors

    **v.**

Michael J. Astrue, Commissioner,
Social Security Administration

Case No. 10-cv-197-PB
Opinion No. 2011 DNH 094

MEMORANDUM AND ORDER

Michael Connors moves to reverse the Commissioner of Social Security's determination that he is not eligible for disability insurance benefits ("DIB"). Connors argues that the Administrative Law Judge ("ALJ") improperly determined that, after Connors suffered a back injury, he was nevertheless capable of performing work available in the national economy and therefore was not disabled during the relevant time period.[1] For the reasons set forth below, I affirm the Commissioner's decision.

---

[1] While Connors originally sought DIB based on his back injury, asthma, chronic obstructive pulmonary disease, and allergies, his appeal focuses only on the ALJ's decision as it relates to the back injury.

1

## I.   BACKGROUND[2]

On February 25, 1997, Connors was diagnosed with
lumbosacral strain[3] after sustaining an injury to his lower back
at work several days earlier (Tr. 109).  Upon examination,
Connors was able to heel and toe walk; his reflexes were equal
bilaterally; he was able to flex thirty degrees at the waist
before being stopped by pain; he could bend to the rear and to
the sides without too much difficulty; straight leg raises were
negative; and he had some point tenderness in the right lower
back (id.).  He was released to work with limitations
restricting him from lifting more than ten pounds, five pounds
frequently (Tr. 109-10).  He was told to avoid all heavy lifting
and bending (Tr. 110).  He was also told to avoid staying in any
position for long periods of time (id.).  Connors was instructed
not to perform bending, kneeling, squatting, climbing, or
reaching (Tr. 110).  He had two follow-up appointments in March

[2] I draw the background information and procedural history from
the Joint Statement of Material Facts submitted by the parties
(Doc. No. 10) and the Administrative Record.  Citations to the
Administrative Record are indicated by "Tr."

[3] A strain is defined as "an overstretching or overexertion of
some part of the musculature." Dorland's Illustrated Medical
Dictionary at 1803 (31st ed. 2007)(Dorland's).  Lumbosacral
relates to the lumbar vertebrae and the sacrum. Stedman's
Medical Dictionary (Stedman's) at 169 (28th ed. 2006). Lumbar is
the part of the back and sides between the ribs and the pelvis.
Id. at 1121.

1997, at which it was noted that Connors was doing better (Tr. 112, 114).

At a follow-up appointment on April 2, 1997, Connors reported continued pain on the right side of his lumbosacral area with some radiation up into the thoracic area[4] (Tr. 116). Upon examination, he walked easily and was able to walk well on both heel and toe (id.). He had equal deep tendon reflexes bilaterally (id.). Straight leg raising was negative and he was able to flex and extend at the waist without any great discomfort (id.). There was some point tenderness in the right lumbosacral area and spasm of the paravertebral muscles extending through the lumbosacral area up into the lower thoracic area (id.). His hamstrings were also extremely tight (id.). He was prescribed Flexeril,[5] added to the Naprosyn,[6] and was told to continue to attend physical therapy (id.). His work limitations included no lifting of more than twenty pounds or ten to fifteen pounds frequently, and no bending or reaching

---

[4] The thoracic area is the upper part of the trunk between the neck and the abdomen. Stedman's at 1982.

[5] Flexeril is for use as "an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions." Physician's Desk Reference at 1985 (58th ed. 2004)("PDR").

[6] Naprosyn is a non-steroidal anti-inflammatory drug used to relieve pain. See PDR at 2902-2903.

(id.).  Connors participated in physical therapy in March and April 1997 and was discharged from physical therapy with reports of decreased pain in his lower back (Tr. 118-40).

On September 30, 1997, Dr. Coleman Levin completed an independent medical evaluation of Connors (Tr. 904-09).  He diagnosed right dorsolumbar[7] paraspinal muscle strain and possible right L5-S1 disc herniation[8] (Tr. 904).  Dr. Levin stated that Connors had full-time work capacity and was able to lift up to twenty pounds on an occasional basis (id.). He stated that Connors needed the opportunity to change positions and he needed to avoid repetitive bending (id.).  Dr. Levin stated that the prognosis for recovery was excellent and he did not expect a permanent impairment (Tr. 905).

Connors was seen by Dr. Roy Hepner for his back pain from October 1997 through April 1998 (Tr. 169-84). On October 20, 1997, Connors complained of low back pain (Tr. 169).  He was not taking any medication at the time (id.).  Dr. Hepner noted that standing spine films demonstrated distinct mild narrowing through the L4-5 level without evidence of instability

---

[7] Dorsolumbar is the area "pertaining to the back and the loins, especially the region of the lower thoracic and upper lumbar vertebrae."  Dorland's at 570.

[8] A herniated disc is the protrusion of a degenerated or fragmented intervertebral disc into the intervertebral foramen. Dorland's at 549.

4

(Tr. 170).  He assessed a chronic lumbar strain and referred Connors to physical therapy (id.).  On December 5, 1997, Connors was discharged from physical therapy due to his failure to make or keep scheduled appointments (Tr. 148).

On February 12, 1998, Dr. Hepner reported that Connors' MRI demonstrated desiccation of the L4-5 disc with posterior protrusion, which was sufficient to be described as herniation (Tr. 180).  There was also some effacement of the thecal sac (id.).  Dr. Hepner assessed Connors with L4-5 disc disruption[9] and scheduled a discography (id.).  On March 25, 1998, Connors underwent a discography with Dr. Hepner and was diagnosed with chronic lumbar sprain (Tr. 150).  On April 16, 1998, Dr. Hepner reported that Connors felt fairly good and avoided heavy lifting and repetitive bending (Tr. 183).  Dr. Hepner noted that Connors had light duty job offers that he planned to pursue (id.).

After a physical examination at the April 16, 1998 appointment, Dr. Hepner reported that Connors was able to flex his trunk to reach within seven inches of the floor, which was "a good improvement over past evaluations" (Tr. 183).  Dr. Hepner urged Connors to continue his exercises and recommended

---

[9] Disc disruption "occurs when the disc tears or cracks (fissure) allowing the nucleus pulposus to meet the annulus fibrosus." Discogenic Low Back Bain, http://www.spineuniverse.com/conditions/back-pain/discogenic-low-back-pain (last visited May 24, 2011).

that he avoid heavy lifting (forty pounds, twenty pounds frequently) or repetitive lifting (Tr. 183-84).  He also recommended changing positions frequently (id.).  Dr. Hepner reported that Connors could return to work with modification (Tr. 184).  He noted that he would see Connors again in one month for re-evaluation, but there are no further records of subsequent visits (Tr. 183).

Connors was also seen by Dr. Margaret Tilton from April 1997 through November 1998 with complaints of back pain (Tr. 185-97).  On April 23, 1997, a scan of the lumbosacral spine revealed minimal degenerative facet joint[10] changes at L5-S1 that are consistent with early degenerative disc disease[11] (Tr. 189).  There was no evidence of fracture or subluxation[12] (id.).  Dr. Tilton noted that Connors' acute low back pain resolved on April 30, 1997 (Tr. 190).

On October 13, 1998, Connors again complained to Dr. Tilton of constant back pain (Tr. 192).  At the time he was taking

---

[10] Facet joints are the synovial joints between articular processes of the vertebrae.  Stedman's at 1014, 1016.

[11] Degenerative disc disease is "a term used to describe the normal changes in your spinal discs as you age." http://www.webmd.com/back-pain/tc/degenerative-disc-disease-topic-overview (last visited May 24, 2011).

[12] Subluxation is "an incomplete or partial dislocation." Dorland's at 1817.

Aleve for his pain (Tr. 193). Connors' neurological evaluation was normal and his gait remained intact with the ability to squat and stand without use of his hands (Tr. 193). Connors exhibited marked bilateral lumbar paraspinal spasm and reduced motion on flexion, extension, and bending (id.). Straight leg raising, reverse straight leg raising, and Faber's maneuver were all negative bilaterally (id.). Dr. Tilton diagnosed Connors with L4-5 herniated nucleus pulposus[13] with intermittent radicular[14] pain (id.). She noted that Connors was not a candidate for surgery, but recommended more invasive pain management such as epidural steroid injections or nerve root blocks (id.). At another visit on November 17, 1998, Dr. Tilton listed Connors' work restrictions as maximum lifting of fifteen pounds (ten pounds frequently), no bending, and occasional kneeling, squatting, and climbing (Tr. 195-96).

Upon referral by Dr. Tilton, Connors was seen for pain management with Dr. Thomas Menke from December 1998 through March 1999 (Tr. 202-19). Connors received epidural steroid injections on December 21, 1998 and January 7, 1999 (Tr. 204, 209, 211). After the injections, Connors noted that his pain

---

[13] Nucleus pulposus is "the soft fibrocartilage central portion of the intervertebral disc." Stedman's at 1343.

[14] Radicular is defined as "of or pertaining to a root (radix) or radicle." Dorland's at 1595.

symptoms were nearly completely resolved (Tr. 209- 11).
Connors received another injection on March 11, 1999, after
feeling increased pain from bending at work (Tr. 212, 218).

On March 10, 1999, Connors' medical records were reviewed
by Dr. Kenneth Polivy (Tr. 198-201).  Dr. Polivy opined that
Connors sustained an acute lumbosacral sprain which resolved in
April 1997 (Tr. 200).  Dr. Polivy stated that he believed
Connors' L4-5 disc degeneration was present on the basis of
degenerative wear and tear over the years (id.).  He recommended
weight reduction, exercise, and strengthening to help alleviate
Connors' pain (Tr. 201).

While Connors continued to seek medical treatment for a
variety of other physical ailments between 1999 and 2005,
Connors did not complain of back pain again until after June 30,
2005, his date last insured ("DLI") (Tr. 382-482).  Examinations
during that time revealed normal musculoskeletal findings (Tr.
403, 417, 427, 449, 476, 481).

In April of 2006 Burton Nault, M.D., a non-examining state
agency medical consultant, reviewed the evidence of record and
completed a Physical Residual Functional Capacity Assessment of
Connors from October 1, 1997, through June 30, 2005 (Tr. 273-
80).  Dr. Nault opined that Connors could occasionally lift
and/or carry twenty pounds, frequently lift and/or carry ten

pounds, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and occasionally perform postural functions (Tr. 274-75).

Connors continued to be seen for back problems at Family Care of Farmington after his DLI.  At an appointment with Dr. Tyler Edwards on December 21, 2006, Connors complained of neck and lower back pain, which he stated started bothering him more when he started working again doing pool work (Tr. 315).  Films of Connors' lumbar spine taken in October 2006 showed lower lumbar degenerative changes (Tr. 320).  Films of his cervical spine were normal (Tr. 520).  A December 2006 MRI revealed degenerative disc disease at L4-L5 with a broad based disc bulge and superimposed posterior central/left paracentral disc herniation; broad based posterior disc bulge at L5-S1; and mild degenerative change of the facet joints at L4-L5 and L5-S1 (Tr. 312).

On October 20, 2006, Connors underwent an initial physical therapy evaluation for back pain (Tr. 515-17). He reported experiencing low back pain for ten years (Tr. 515). Connors exhibited decreased bilateral trunk range of motion, bilateral trunk pain and radicular symptoms down the left lower extremity,

increased lumbar lordosis,[15] and decreased postural and body
mechanics awareness (id.).  Expected outcome at discharge (after
four to six weeks) included range of motion within normal
limits, decreased pain, compliance with home exercise and
independent pain management, increased activities of daily
living, proper posture and body mechanics, and a return to work
with lifting restrictions (id.).  Connors was seen for a total
of seven visits, but was eventually discharged because he failed
to appear for appointments (Tr. 517).

From December 2006 through February 2007 Connors also went
to Dr. O'Connell's Paincare Centers and saw John Kane, ARNP,
CRNA, (Tr. 874-83).  On December 21, 2006, Connors complained of
chronic back pain radiating into his legs (Tr. 874).  Kane noted
that an MRI of the lumbar spine showed degenerative disc disease
of the lumbar spine with broad base disc bulge and left
paracentral disc herniation that had a mass effect on the L5
nerve root (id.).  Upon examination, Connors' gait, range of
motion in the extremities, and strength were normal with no
joint enlargement or tenderness (Tr. 875-76).  Connors reported
pain and tenderness in his cervical, thoracic, and lumbar spine
(Tr. 876).  Range of motion in his cervical, thoracic, and

---

[15] Lumbar lordosis is "the normal, anteriorly convex curvature of
the lumbar segment of the vertebral column."  Stedman's at 1119.

lumbar spine was limited due to pain (id.).  Connors'
neurological functions were largely intact except for absent
reflexes and what appeared to be left leg radicular changes from
his hip to his knee (id.).

On January 10, 2007, Connors received an epidural steroid
injection and facet injections to help with his back pain (Tr.
878).  On January 25, 2007, Connors reported that his pain was
more manageable and his level of function improved since
starting chronic narcotic therapy (Tr. 880).  Upon examination,
Connors was unchanged from December 21, 2006, except pain with
compression over lower lumbar was much less since facet
injections (Tr. 881).  Connors received another epidural steroid
injection on February 23, 2007 (Tr. 883).

On March 14, 2007, Kane completed a Residual Functional
Capacity questionnaire for Connors, noting that he had first
seen Connors on December 21, 2006 (Tr. 896-900).  He reported
that Connors' pain was moderate in nature (Tr. 896).  Kane
opined that Connors' pain would frequently interfere with
attention and concentration needed to perform even simple work
tasks (Tr. 897).  He opined that Connors' back impairment
lasted, or could be expected to last, at its current level of
severity since the late 1990's (id.).  He opined on the
following limitations: Connors could walk one city block without

rest or severe pain, sit for fifteen minutes at one time, stand for fifteen minutes at one time, and sit and stand and/or walk for less than two hours in an eight-hour workday (Tr. 897-98). He further opined that Connors needed to walk every sixty minutes for five to ten minutes (Tr. 898).  Kane stated that Connors needed a job that allowed him to shift positions and take unscheduled work breaks (id.).  He noted that Connors possibly needed a cane to walk (id.).

Kane also opined that Connors could rarely lift weight of less than ten pounds and never lift anything more than that (Tr. 899).  He stated that Connors could never twist, stoop, crouch, squat, and climb ladders (id.).  He noted that Connors could rarely climb stairs (id.).  Kane opined that Connors had no limitations with reaching, handling, or fingering (id.).  He stated that Connors was likely to be absent from work for more than four days per month (id.).  When asked what the first date was that the limitations and symptoms in the questionnaire applied, Kane reported that he first saw Connors on December 21, 2006 (id.).  Kane concluded that he did not feel Connors would ever be able to go back to manual labor type jobs, but that did not prevent him from being retrained (id.).

Kane also reported that Connors had degenerative disc disease with evidence of nerve root compression and neuro-

anatomic distribution of pain (Tr. 901).  He stated that
Connors had limited motion of the spine, an inability to walk on
heels, and an inability to squat (id.).  He stated that Connors
had no muscle weakness (id.).  Kane reported that Connors had
reflex loss and positive straight leg raising only when sitting
(Tr. 902).  He opined that Connors' impairments were equivalent
to the severity of conditions in Listing 1.04A (id.).

On January 1, 2006, Connors completed a function report
(Tr. 69-76).  He reported his day as follows: wake up at 6:00
a.m. with his daughter and eat breakfast, take daughter to
babysitter, go home to sit and relax, begin cleaning the house
and doing dishes, eat lunch, pick up daughter at 2:00 p.m., play
with daughter, eat dinner, watch television, and go to bed (Tr.
69).  He reported that he bathed and fed his daughter, and
watched television and read with his daughter (Tr. 70).

Connors stated that he slept one hour at a time on and off
all night and his loss of energy and breath impacted his ability
to dress and bathe (Tr. 70).  He stated that he prepared his own
meals, did laundry, and cleaned (Tr. 71).  Connors reported that
he did not do yard work or any other outdoor activities due to
his asthma and allergies (Tr. 72).  He stated that he went
outside twice per day (id.).  Connors reported that he drove a
car and went grocery shopping, but that he no longer played

13

pool, rode his bike, or went sledding (Tr. 72-73).

Connors reported that he spent time with his wife and child (Tr. 73).  He stated that he called friends a few times per week and went to watch football once per week, but that he had a hard time dealing with other people since his injury (Tr. 73-74). Connors reported that his abilities had diminished since his injury and that he could only walk 100 feet before needing to rest (id.).  He reported that he was limited in his ability to lift, squat, bend, stand, reach, walk, kneel, climb stairs, concentrate, and get along with others (id.).  Connors stated that he could pay attention for as long as necessary and had no problems following instructions (id.).  He noted that he did not handle stress or changes in his routine well (Tr. 75).  He reported that he was able to get along with authority figures if he was treated with respect (id.).

At the hearing before the ALJ, Connors testified that he pulled something in his back while working (Tr. 940).  He stated that his symptoms improved for a while, but anytime he tried to go back to work it would go back to the way it was when he first stopped working (id.).  He stated that when he tried to go back to work, the jobs entailed manual labor (Tr. 941).  He stated that bending was a big issue for him and he did not know any jobs he could get where he did not have to bend (id.).  Connors

noted that the pain in his back radiated through the left leg
and made his toes feel like they were asleep (Tr. 942).  He
testified that he did not have surgery because he did not have
insurance (id.).  He stated that when he was married, five years
ago, he got medical insurance (Tr. 943).

Finally, Connors testified that he has two young children
(Tr. 948). He stated that they went to the babysitter during the
day because he cannot physically care for them, as he did not
have enough energy anymore (Tr. 949).  He stated that he felt
okay after he woke up in the morning, but after doing something
like laundry, he needed to sit down and rest and watch
television or something because he would start sweating and his
body hurt (id.).

## II.   **PROCEDURAL HISTORY**

Connors filed an application for Disability Insurance
Benefits on March 24, 2005, with an alleged onset date of
October 1, 1997 (Tr. 50-54, 87).  On March 16, 2007, ALJ James
J. D'Alessandro held the hearing described above, at which
Connors, who was represented by counsel, and a vocational expert
testified (Tr. 933-56).  On April 27, 2007, the ALJ issued a
decision in which he found that Connors was not disabled at any

time from October 1, 1997, through March 24, 2005 (Tr. 16-27).[16]
The ALJ's decision became the final decision of the Commissioner
of Social Security ("Commissioner") when the Appeals Council
denied Connors' request for review of the ALJ's decision on
March 17, 2009 (Tr. 8-10).

On July 16, 2009, this Court remanded Connors' case to the
Commissioner for further action and a new decision (see
Tr. 962).  On January 20, 2010, the Appeals Council notified
Connors and his representative that it proposed to issue a
decision finding that Connors was not entitled to benefits under
the Social Security Act (Tr. 962-64).  On April 7, 2010, the
Appeals Council issued another decision in which it adopted the
ALJ's findings and conclusions with the exception of the
findings stating the erroneous date last insured (Tr. 960).
Connors then filed this action challenging that final
administrative decision.

### III.   STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), I am authorized to review the

---

[16] Because plaintiff acquired sufficient quarters of coverage to
remain insured for DIB through June 30, 2005 (Tr. 45-46), in
order to establish disability for DIB purposes, he had the
burden to show that he was disabled on or before that date. See
20 C.F.R. §§ 404.101, 404.130-404.131. The ALJ erroneously
reported this date as March 24, 2005.

pleadings submitted by the parties and the transcript of the administrative record and enter a judgment affirming, modifying, or reversing the "final decision" of the Commissioner of Social Security.  Review is limited to determining whether the ALJ used the proper legal standards and found facts based upon the proper quantum of evidence.  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).

The findings of fact of the ALJ are accorded deference as long as they are supported by substantial evidence.  Ward, 211 F.3d at 655.  Substantial evidence to support factual findings exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  If the substantial evidence standard is met, factual findings are conclusive even if the record "arguably could support a different conclusion."  Ortiz, 955 F.2d at 770.  Findings are not conclusive, however, if they are derived by "ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).  The ALJ is responsible for determining issues of credibility and for drawing inferences from evidence on the

record.  Ortiz, 955 F.2d at 769.  It is the role of the ALJ, not
the court, to resolve conflicts in the evidence.  Id.

### IV.   ANALYSIS

Connors makes two claims in his appeal.  First, he contends
that the RFC determination by the ALJ was not supported by
substantial evidence.  Second, he argues that the ALJ failed to
give appropriate weight to Kane's opinion concerning his RFC.  I
will address each issue in turn.

### A.   The RFC Determination

The ALJ in this case determined that Connors retained the
RFC to perform "light exertional work."  That meant he could
"lift a maximum of twenty pounds occasionally and ten pounds
frequently; and stand and walk at least six hours out of an
eight-hour work day."  (Tr. 22); see 20 C.F.R. §404.1567(b).  At
the hearing a vocational expert ("VE") testified that for an
individual with Connors' age, education, work experience, and
RFC, available jobs existed in the national economy (Tr. 26).
Specifically, the VE testified that Connors was capable of
performing the requirements of a toll collector or security
guard.  Based on the VE's testimony the ALJ concluded that
Connors was capable of making a successful adjustment to other
work and was therefore not disabled during the relevant time

period.  Connors now challenges the RFC that was the basis of
the VE's testimony, arguing that the evidence presented at the
hearing does not support the conclusion that Connors was capable
of performing light work.

In determining a claimant's RFC, an ALJ is required to
assess all of the relevant evidence in the record and resolve
any conflicts in that record.  See 20 C.F.R §404.1545.  Here,
the ALJ accorded significant weight to the medical opinion of
Dr. Levin, who opined that Connors' back injury was not a
permanent impairment and that Connors could work full-time doing
light exertional work.  While Dr. Levin's opinion was rendered
in 1997, the ALJ noted that the opinion was consistent with the
medical record as a whole and Connors' own testimony regarding
his daily activities, which I discuss below.  Other medical
opinions in the record also support the ALJ's conclusion: Dr.
Hepner stated that Connors could lift up to forty pounds or
twenty pounds frequently and should be able to return to work,
and Dr. Polivy does not appear to have placed any limitations on
Connor, recommending only weight reduction, exercise, and
strengthening to help alleviate pain.

In arguing against the RFC determination, Connors relies
heavily on Kane's opinion that Connors could never lift more
than ten pounds and only rarely less than ten, could never bend,

twist, or squat, and would not be able to go back to manual labor jobs, and Dr. Tilton's opinion that Connors was unable to bend.  Dr. Tilton, however, also opined that Connors would be able to gradually return to work, and concluded that in the meantime his work restrictions were only that his maximum lifting not exceed fifteen pounds, that he not bend, and only kneel, squat, and climb on an occasional basis.  These limitations are very similar to the requirements of light exertional work that the ALJ found Connors to be capable of in his RFC determination.  Moreover, even Kane opined that Connors could be "retrained," indicating that he thought Connors was physically capable of jobs that involved sufficiently low amounts of physical exertion.

Finally, the ALJ reasonably gave significant weight to the opinion of Dr. Burton Nault, a nonexamining state agency medical consultant.  See 20 C.F.R. §404.1527(f) (noting that the ALJ may consider the opinions of nonexamining sources).  Nault reviewed the entire medical record and opined that during the insured period Connors could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and occasionally perform postural functions.

Kane's opinion did indicate that Connors was more limited than the RFC determination eventually made by the ALJ, but it is the very role of the ALJ to consider opinions of multiple experts and to resolve conflicting opinions. Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 144 (1st Cir. 1987) (noting that the ALJ is entitled "to piece together the relevant medical facts from the findings and opinions of multiple physicians"). That is precisely what the ALJ did here, as he appropriately considered all of the medical opinions before him and made his own determination of Connors' RFC.

In addition to medical opinions, evidence that a person performs daily activities that are inconsistent with a claimed disability may be considered by an ALJ in determining that person's RFC. See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 29 (1st Cir. 1986); see also Dupuis v. Sec'y of Health and Human Servs., 869 F.2d 622, 624 (1st Cir. 1989) (per curiam) (upholding denial of disability in part because claimant was able to work during the period at issue). Here, Connors testified that his daily activities include having breakfast with his daughter, dropping her off at the babysitter, performing household chores, and cooking. Connors also reported to a doctor in April of 2003 that he had joined a gym and was considering helping his wife stock shelves at her job. These

activities are inconsistent with Connors' claims that he was
fully disabled and incapable of even light work during that
time, and the ALJ properly considered them.

While Connors argues that the ALJ was selective and focused
only on the activities that Connors testified he was capable of
performing, the ALJ's decision does not reflect such an
imbalance.  The ALJ acknowledged Connors' claims of loss of
energy and breath, as well as consistent pain, but determined
that the activities he remains capable of "suggest a greater
physical capacity than that alleged by the claimant," and that
he was thus capable of light work (Tr. 24).

Connors' treatment history also supports the ALJ's RFC
determination.  Gaps in a claimant's medical record may be
considered as evidence that an injury is not as severe as
alleged.  See Ortiz, 955 F.2d at 769.  Here, while Connors
sought medical treatment immediately after his back injury in
1997, he failed to effectively pursue physical therapy that was
assigned to him as part of his treatment.  In fact, after 1998
Connors did not seek any further treatment for his back until
after his date last insured.  When Connors was being seen at
Family Care of Framingham from January 2003 through June of 2005
for problems related to his asthma and COPD, there is no
evidence that he complained of back pain and his examinations

did not reveal any abnormal musculoskeletal findings.  While he did undergo a physical therapy evaluation in 2006 for his back pain, he was discharged from the program after seven visits because he failed to appear for appointments.

These facts regarding Connors' treatment history are further evidence in support of the ALJ's determination that Connors was capable of light work.  Considered together, the objective medical evidence, the medical opinions, Connors' own testimony regarding his daily activities, and his treatment history are more than enough to meet the threshold of substantial evidence needed to support the ALJ's findings.

**B.   Weight of Kane's Opinion**

Connors' second contention is that the ALJ erred by failing to expressly address Kane's opinions regarding his RFC.  In particular, he focuses on the ALJ's failure to adopt Kane's opinions that Connors could only sit or stand for fifteen minutes at one time, could only sit or stand for less than two hours in an eight-hour workday, and could not ever lift more than ten pounds while at work (Tr. 897-99).  These limitations correspond to a less-than-sedentary RFC.

While an ALJ may not simply ignore relevant evidence, it is also not necessary to directly address every piece of evidence in the administrative record.  See Lord v. Apfel, 114 F. Supp.

2d 3, 13 (D.N.H. 2000); see also Rodriguez v. Sec'y of Health & Human Servs., 915 F.2d 1557, 1990 WL 152336, at *1 (1st Cir. 1990)(per curiam, table decision)("An ALJ is not required to expressly refer to each document in the record, piece-by-piece."). In Lord, which Connors relies upon heavily, the ALJ's RFC determination was inadequate because it "completely failed to mention any of the post-hearing evidence," which in turn made it impossible for a reviewing court to determine "if significant probative evidence was not credited or simply ignored." 114 F. Supp. 2d at 14.

The same concerns are not present here. The ALJ explicitly stated that he gave significant weight to Kane's opinion "to the extent that the claimant is unable to perform manual labor" (Tr. 24). This statement is sufficient to make clear that the ALJ fully considered Kane's opinion and chose to credit some parts while discrediting others – there is no indication that the ALJ ignored Kane's opinions entirely, as there was in Lord. While the ALJ did not agree with everything Kane concluded, determinations of credibility and resolving conflicting opinions are exactly the kinds of decisions ALJ's are required to make. See Rodriguez, 647 F.2d at 222. As I have discussed above, substantial evidence supported the conclusion the ALJ did come to, and therefore Connors' arguments are without merit.

24

## V.  <u>CONCLUSION</u>

The ALJ did not err at any point in the five-step process. For the foregoing reasons, I grant the Commissioner's Motion to Affirm the Decision of the Commissioner (Doc. No. 9) and deny Connors' motion (Doc. No. 7).  The clerk is directed to enter judgment accordingly and close the case.

SO ORDERED.


<u>/s/Paul Barbadoro</u>
Paul Barbadoro
United States District Judge


June 10, 2011

cc:  D. Lance Tillinghast, Esq.
     Gretchen Leah Witt, Esq.